the Tuaolo title to Punefu.

**CHRISTINA MAIFEA, and POSIULAI MAIFEA, a Minor, by
SAM MAIFEA, Her Guardian ad Litem, Plaintiff**

**v.**

**NATIONAL PACIFIC INSURANCE CO., EDWARD CRICHTON
& CO., and POTLATCH CRICHTON, Defendants**

High Court of American Samoa
Trial Division

CA Nos. 7-93, 8-93

January 31, 1995

104

Before RICHMOND, Associate Justice, and BETHAM, Associate Judge.

Counsel: For Plaintiffs, Gata E. Gurr
 For Defendant National Pacific Insurance, Ltd., Roy
 J.D. Hall, Jr.
 For Defendants, Edward Crichton & Co. and Potlatch
 Crichton, Roy J.D. Hall, Jr. and Asaua Fuimaono

Opinion and Order:

This is case arises from an unfortunate motor vehicle accident in which two individuals were ejected from the bed of a pickup truck and injured. Their separate actions for damages from personal injuries were consolidated and came regularly for trial on July 14 and August 18 and 19, 1994. All parties appeared by their counsel. Plaintiff Christina Maifea ("Christina") was personally present throughout the trial. Plaintiff Posiulai Maifea ("Posiulai") and Defendant Potlatch Crichton ("Potlatch") were personally present on July 14.

## I. LIABILITY

*A. Findings of Fact*

On Sunday, May 31, 1992, at about 5:00 p.m., Potlatch was driving a blue

Toyota pickup and Brian Maifea ("Brian") was driving a white Nissan pickup, both traveling westward on the main public road in Nuuuli, American Samoa. The accident occurred in the immediate vicinity of the Pacific Resources Industry's Gas Express station, west of the three-corner intersection with the road to Lions Park. The Toyota was owned by defendant Edward Crichton & Co. ("ECC") and insured by defendant National Pacific Insurance Co. ("NPI").

Earlier that afternoon, Potlatch, his sisters Wendy Crichton ("Wendy") and Lorita Crichton ("Lorita"), and others were moving the ECC office from Fagatogo, American Samoa to a new location. Edward Crichton, the Crichton children's father, Wendy; and Lorita were the only authorized drivers of the Toyota under ECC's company policy. However, Potlatch, who was then age 21 years, took over the wheel for the last two relocation trips. Shortly before 5:00 p.m., they ceased working to return to their home in Leone (Lepuapua), American Samoa, to prepare for their evening church service. Potlatch remained the driver of the vehicle for the trip home. Besides Potlatch, five other young persons were in the Toyota on the trip home. Lorita's son was seated in the cab beside Potlatch. Seated in the bed of the pickup were Wendy, located at the left rear, a female identified as Julie, at the right rear, both facing the cab, John Atofau Tuitele ("John"), at the forward right side, and a male identified as Sililo, at the forward left side, both facing the rear of the pickup.

Brian and his sisters Christina and Posiulai attended church in the portion of Nuuuli located on the Coconut Point peninsula. After the service was over, they left for home in Nuuuli, across the main road from Pete's Hut a short distance west of the turnoff road to Pago Pago International Airport. Brian, then age 17 years, drove the Nissan, and was seated alone in the cab. Christina, then age 21 years, and Posiulai, also age 17 years, were standing in the forward end of the bed, respectively at the left and right. The girls were holding onto the open sunroof with one or both hands throughout the journey homeward.

Upon reaching the main road in the Nissan, Brian waited while four or five vehicles passed heading west before making a left turn onto the road. From that point to the accident scene, Potlatch was driving the Toyota to the rear of the Nissan, driven by Brian. Traffic was also moving eastbound. Light rain or drizzle had been falling but had ceased.

Occupants of the two vehicles diversely described events as they headed to the collision point. Taken as a whole, the Nissan group portrayed Brian driving at a lawful speed behind four or five vehicles, while Potlatch drove

the Toyota immediately behind the Nissan, closely at times, and attempted several passes, varying somewhat in number and location, only to be thwarted by oncoming vehicles. Essentially, they denied any interplay between the vehicles' drivers and passengers.

On the other hand, the Toyota group, while confirming the several passing attempts, maintained that on each occasion, Brian moved the Nissan to the left, or sped up, to prevent the passing. They also claimed that Christina and Posiulai were waving and smiling at them.

Without pinpointing or resolving the precise details of these pre-accident events on the main road, we are persuaded that both Potlatch and Brian were displaying the immature judgment all too often seen when youthful peers take the wheel, egged on by at least some of their equally youthful passengers. In short, Potlatch and Brian were mutually joyriding and headed toward the impending disaster.

Approaching the collision point, Potlatch again attempted to drive the Toyota past the Nissan. With no approaching vehicle immediately ahead, he crossed double yellow lines and was driving in the oncoming traffic lane at 35 to 40 mph. Traveling westward, the road in this area first goes uphill perceptively and then, quite gradually, curves left. Commercial facilities are plentiful along the bend, with two gas stations and at least two stores open on Sundays at that time.

Brian neither slowed the Nissan down nor moved it to the right. Rather, he moved the Nissan to the left, towards the overtaking Toyota, and the protruding oversized, left rear tire on the Nissan collided with the right side of the Toyota. This contact occurred near the crest of the hill where the slightly bending road begins to traverse through the commercial area.

Potlatch lost control of the Toyota, and it veered to the left before coming to a stop at the westward curb of the bus stop on the seaward side of the road, across from the Gas Express station. Julie and Sililo were thrown out of the Toyota bed by the impact with the curb onto the paved bus stop. Wendy was almost thrown off. All three received minor injuries. John remained within the bed and was not injured.

Brian also lost control, momentarily. As he corrected the Nissan, Posiulai was ejected from the bed onto the paved road and was seriously injured. Next, as Brian increased the Nissan's speed, Christina was dislodged out of the bed onto the road and was also seriously injured.

107

Apparently, Brian was not immediately aware of his sisters' plight and drove from the scene, at least as far as the store buildings just before or beyond the Aiga Basket grocery. By the time he returned and parked on the roadside near the Gas Express station, a pickup moving eastward, had stopped, and several persons were placing Posiulai and Christina into the bed of this vehicle, which took both girls, followed by Brian in the Nissan, to the American Samoa Government's LBJ Tropical Medical Center at Faga`alu, American Samoa, for medical treatment.

## B. Discussion

 Both Potlatch and Brian were under the duty to drive their respective motor vehicles with ordinary or reasonable care, which persons of ordinary prudence would use under the circumstances, in order to avoid injury to themselves or others. Failure to use ordinary or reasonable care is negligence. Injured persons are entitled to compensation when a defendant's negligence is the proximate cause of the injury.

Potlatch attempted to drive his Toyota past the left side of Brian's Nissan and at least one other vehicle ahead of the Nissan. He crossed a double yellow line, an official traffic-control marking designating a no-passing zone. This no-passing zone reduces hazards in an area where the road's character is uphill and gradually curving through an area with substantial commercial activity, even on Sundays. Significant traffic was moving in both directions. He proceeded in the lane against oncoming vehicles at speeds 10 to 15 mph in excess of the authorized 25-mph speed limit in this area.

 Potlatch was not using ordinary or reasonable care under these circumstances and was negligent. In fact, his driving constituted careless driving in violation of A.S.C.A. § 22.0701,[1] prohibited overtaking in violation of A.S.C.A. § 22.0209, and hazardous passing in violation of A.S.C.A. § 22.0307(e)(1), and, thus, for any or all of these reasons, he was negligent per se. Neither Christina nor Posiulai would have been injured but for Potlatch's negligence. Thus, Potlatch proximately caused these injuries.

Brian failed to take reasonable precautions when he neither slowed down

---

[1] He was cited for violating this statute, as a Class B misdemeanor involving bodily injury to any person, and his plea of guilty to this offense is properly considered an admission of negligence in this action.

nor moved away from the Toyota during the final attempted passing. He was abundantly aware of Potlatch's several, earlier overtaking efforts. Instead, whether deliberately or carelessly, he essentially impeded the passing Nissan. He, too, was negligent, and neither Christina nor Posiulai would have been injured but for his negligence. Thus, Brian also proximately caused these injuries.

■ Potlatch's and Brian's negligent conduct operatively acted and produced Christina's and Posiulai's injuries. Their conduct contributed concurrently as proximate causes of these injuries, but Potlatch cannot be relieved of responsibility simply because Brian was not joined as a defendant in this action. Each of them is jointly and severally liable to compensate Christina and Posiulai.

■ However, Christina and Posiulai also cannot be excused from responsibility for causing their own injuries. This case demonstrates the clear and present danger of riding in pickup beds, and the greatly increased hazards of standing in the bed compared to sitting in the bed. The four persons in the Toyota bed causally contributed to their injuries from the accident, but the minor nature of their injuries, at least on this occasion, points out the relative safety of sitting opposed to standing in the bed. Christina and Posiulai were seriously injured due in substantial part to the extreme hazard of standing. On a comparative basis, as required under A.S.C.A. § 43.5101, while their contributory negligence does not preclude recovery, we assess their fault at three-fourths in factoring the proximate causes of their injuries.

## C. Insurer's Liability

■ A.S.C.A. § 22.2003 states, in relevant part:

An owner's policy of liability insurance:

. . . (2) shall insure the person named therein and any other person who uses the vehicle or vehicles with the express or implied permission of the named insured . . .

■ NPI is the insurer of the subject vehicle for ECC, the "named insured." The sole question for NPI is whether Potlatch drove the vehicle with ECC's "express or implied permission." Evidence plainly indicates that there are only three drivers authorized to drive the vehicle under ECC's company policy. Potlatch is not among the authorized drivers. For this reason, we find that Potlatch had no "express" permission to drive the

vehicle. Although Potlatch received express permission to drive from Wendy, an authorized driver, we have no evidence that the owner had provided Wendy with express authority to transfer her driving privileges to others.

In this case, however, the lack of authorization to drive a vehicle under ECC company policy cannot be construed as a denial of permission for Potlatch to drive. Potlatch was not a regular ECC employee and, therefore, had no regular need to be listed as an authorized driver. This raises the question of whether Potlatch had "implied permission" to drive the vehicle. Since "implied permission" is not defined by statute in American Samoa, we look to case law for its meaning.

■ Permission to drive a vehicle may be implied from a failure to take precautions to prevent an individual from driving a vehicle in circumstances where it is reasonably foreseeable that the person might do so. *See Sataua v. Himphill*, 5 A.S.R.2d 61, 68 (Trial Div. 1987). In the absence of evidence that the family did anything to prevent Potlatch from driving, the sole factual issue is whether it was reasonably foreseeable that Potlatch might drive the company vehicle during the relocation of the family business.

In *Himphill*, this court held that the owner of a vehicle had not given implied permission for a repairman to take the vehicle joyriding, because the nature of the authorized work on the vehicle did not require that the vehicle be driven. 5 A.S.R.2d at 67-68. In dicta, the *Himphill* court distinguished its result from cases in which consent to drive was implied from parents' "leaving the car keys lying around and accessible to errant children," or where an owner left his keys in the ignition, and the vehicle was stolen. *Id.* at 68 (distinguishing *Minute v. Hartford Fire Insurance,* CA No. 3260-75, slip op. (1976), *Te`o v. Continental Insurance,* AP No. 16-84, slip op. (1985), and *Hoskin v. Robles*, 159 Cal. Rptr. 369 (1979)).

■ We must determine whether this case is closer to the facts of *Himphill* in which permission was not implied, or to the dicta in which permission was implied. We find that our case is closer to the dicta. Although Potlatch was driving irresponsibly, he was engaged in the activity for which the vehicle had been entrusted to his group. Further, we find that Potlatch's open participation in moving the business made his driving of the vehicle even more foreseeable than either of the above situations where keys were taken from an unknowing owner. In giving express permission to assist in the relocation of the family business, ECC implicitly gave permission for Potlatch to take action reasonably necessary to complete the

110

move, which included driving the ECC vehicle due to the illness of the authorized driver.[2]

We find it reasonably foreseeable that any person in a group relocating a business may be called upon by an authorized driver to drive in the event of an illness affecting the authorized driver, or some other condition making it inconvenient for the authorized driver to take the wheel at a given moment. The aims of the statute would be frustrated if a business or its insurer could escape liability for the accidents caused by non-authorized drivers while they are in the act of voluntarily benefiting the business. In dicta, this court approved a New York case which found "implied consent where the nature of the work requested is such as to suggest or indicate to a reasonably prudent person that the car must be or will be driven to accomplish the work or repair." *Himphill*, 5 A.S.R.2d at 67-68 (*quoting Zuckerman v. Parton*, 184 N.E. 49 (N.Y. App. 1933)). In this case, it was reasonable to expect contingencies in the course of the relocation of the business that would require a driver other than Wendy to operate the vehicle.[3]

## D. Owner's Liability

The determinative issue concerning ECC's liability is whether or not the family purpose (or family car) doctrine applies to ECC, as a corporation, for allowing Potlatch to drive its vehicle.

---

[2] A vehicle owner cannot restrict his consent to a particular manner of driving in order to escape liability under the automobile consent statutes. *Himphill*, 5 A.S.R.2d at 66. Although ECC did not consent to the negligent driving of Potlatch as a necessary act to complete the move, the law is well settled in American Samoa that an insurer of an employer remains liable for the tortious driving of a servant. *Tung Ton v. Siauni Ah Sam*, 4 A.S.R. 764, 772 (Trial Div. 1971).

[3] We acknowledge that Potlatch was not a licensed driver, and should not have been driving. The issue in this case, however, is whether ECC should have foreseen that Potlatch might elect to drive the company vehicle notwithstanding his lack of legal authority. There is no evidence that ECC had notice that Potlatch was unlicensed, and even if such evidence were before us, ECC, a family business, should have known that Potlatch was prone to drive without a license, because he had driven the company vehicle on previous occasions.

■ Liability based upon the family purpose doctrine was adopted in *Gibson v. Mulitauaopele*, CA No. 19-92, slip op. (1993), where this court stated that when "the head of a family owns, furnishes and maintains a vehicle for the general use, pleasure and convenience of a family, he is liable for the negligence of a member of the family having general authority to drive it while the vehicle is so being used." *Id.*, slip op. at 2 (citations omitted). The doctrine was created to permit an injured person to recover damages from a vehicle's owner if the driver is "financially irresponsible." *Id.* (citations omitted).

■ Even though it is a corporation, we find that ECC is liable under the principles of the family purpose doctrine. Although Potlatch was not an ECC employee, evidence shows that he was driving at the time of the accident to assist the family business in its relocation. He was motivated by his allegiance to his family and not out of employment obligations to ECC. Evidence further shows that ECC owned the vehicle and that Edward Crichton, ECC's president, allowed the vehicle to be used by his household for personal matters. Moreover, as indicated above, Potlatch was driving the vehicle with ECC's implied permission at the time of the accident. The fact that the vehicle is owned by the family business or is at times used for business purposes does not matter or preclude the application of the family purpose doctrine. *Durso v. A.D. Cozzolino*, 20 A.2d 392, 394 (Conn. 1941) (father held liable under the family purpose doctrine for his daughter's negligence, when she was driving her father's permission, and where the vehicle was owned by the family corporation and used for both business and personal matters). In applying the family purpose doctrine to a corporation, the *Durso* court reasoned:

> [I]f a car is maintained for the general use of a family, we see no valid distinction between a situation where it is owned and maintained by a member of the family, and one where it is owned and maintained by a family corporation for the use of the family of its managing head and one of its principal stockholders. In such a situation the controlling element is the scope of the intended use rather than the mere fact that it is owned and maintained by the corporation . . . . Indeed, to hold otherwise, would make it possible, in the case of a family corporation such as the one before us, to avoid liability under the family purpose doctrine by having automobiles for the use of the families of its officers owned and maintained by the corporation.

*Id.* at 394. In finding that Potlatch was driving ECC's vehicle, with ECC's implied permission, and in furtherance of assisting the family

112

multiple abrasions, affecting the left shoulder, knee and ankle, and on the right little finger, pelvis, thigh, knee and ankle. She lost the nail of the left great toe and received contusions of the neck and abdomen. X-rays of her left clavicle and shoulder, however, were normal.

Christina was also discharged on June 4, 1992, and was seen at follow up examinations on June 15 and July 15 and 25, 1992. At these examinations, she complained of continuing blurred vision and dizziness, and various testing was conducted with negative results. The ophthalmological examination revealed no eye pathology. Abnormalities were not found during orthopedic and neurological evaluations. The audiogram indicated normal hearing.

However, Christina reported occasional headaches and fainting spells at examinations on October 15, 1992, and February 3, 1993, and has experienced repeated episodes to the present time. Dr. Tuato`o recommends off-island investigation and treatment, especially a brain scan, to determine the possible presence of brain contusions as causes of the headaches and blurred vision. Christina's wounds healed with scarring, but corrective surgery was not suggested.

As with Posiulai, we have not been presented with any concrete evidence of Christina's actual damages, past or future, and therefore, limit the award to damages for pain and suffering, inclusive of medical expenses. In Christina's case, we assess these damages at $12,000 and due to her negligence, reduce the amount to $3,000.

### III. CONCLUSIONS

The foregoing findings lead us to the following conclusions of law:

1. Posiulai and Christina were injured as the proximate result of the negligent operation of motor vehicles by Potlatch and Brian. Notwithstanding Brian's non-party status, he and Potlatch are jointly and severally liable for the damages suffered by Posiulai and Christina.

2. Posiulai and Christina were injured also as the proximate result of their own negligent conduct. On a comparative basis, each of them must take the blame for three-fourths of their own respective injuries.

3. The responsibility shared by Potlatch and Brian jointly and severally for Posiulai's total damages in the amount of $20,000 must be reduced to $5,000.

business, we hold that ECC is liable under the principles of the family purpose doctrine.

## II. DAMAGES

### A. *Posiulai*

Posiulai lost consciousness when she landed on the pavement and did not, at least fully, regain it for some 24 hours. In addition to the cerebral concussion, she sustained a scalp laceration, requiring sutures, multiple abrasions and contusions to her lower back and both knees. She was hospitalized until June 4, 1992, and examined again on June 15 and July 15 and 30, 1992.

During these later examinations, Posiulai complained for the first time of right ankle pain and difficulty in walking. Dr. Ronald V. Vineyard found no X-ray or physical evidence of structural or functional abnormality, noted normal gait and lack of any complaint upon admission, and concluded that the complaints of ankle pain were subjective in nature. On the other hand, based on his review of the medical records and examination on July 6, 1994, Dr. Vaiula Tuato`o concluded that Posiulai did suffer a deep fracture of the ankle bone, which resulted in continuing pain and swelling to the present time and 16% disability of the right leg due to impaired ankle movements.

Posiulai has a disfiguring scar from her healed head laceration and still suffers from severe headaches, at times as frequently as several times a day. Dr. Tuato`o is of the view that Posiulai should undergo plastic surgery to improve the appearance of the scar area and a brain scan to diagnose the continuing headaches.

Without any specific evidence before us of Posiulai's actual damages resulting from either past or prospective medical expenses, we are limited to awarding damages for pain and suffering, inclusive of actual damages. Doubtlessly, Posiulai experienced and still experiences substantial pain and suffering. We assess these damages at $20,000 and, after applying our finding on comparative negligence, award Posiulai $5,000.

### B. *Christina*

Christina did not entirely lose consciousness upon striking the pavement, but she apparently has little, if any, memory of events until the following day. She, too, suffered a cerebral concussion, scalp laceration, and

113

4. The responsibility shared by Potlatch and Brian jointly and severally for Christina's total damages in the amount of $12,000 must be reduced to $3,000.

5. NPI, as the insurer of ECC's vehicle, is liable for all damages attributed to Potlatch, subject to the legal limitations of the insurance policy.

6. ECC, as owner of the vehicle, is liable for all damages attributed to Potlatch, in light of the family purpose doctrine. Judgment shall enter accordingly.

It is so ordered.